UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TAMARA LEVY,

Plaintiff,

- against -

EXODUS MOVEMENT INC.,

Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
25-CV-2975 (PKC) (LKE)

PAMELA K. CHEN, United States District Judge:

Plaintiff Tamara Levy, proceeding *pro se*, is a user of Defendant Exodus Movement Inc.'s ("Exodus") platform to store various cryptocurrencies in a digital wallet ("Exodus Wallet" or "Wallet"). She has brought this action against Exodus in the wake of alleged thefts by an unknown third party of hundreds of thousands of dollars' worth of cryptocurrency assets from Plaintiff's Exodus Wallet. Exodus now moves for an order compelling arbitration pursuant to Exodus' terms of service (the "Terms"),[1] or, in the alternative, dismissal for failure to state a claim. For the reasons below, the Court grants the motion to compel arbitration, stays the case, and denies Defendant's motion to dismiss as moot.

## BACKGROUND

### I. Plaintiff's Factual Allegations

At the time Plaintiff initiated this action, she had been a user of a digital wallet through Defendant Exodus's platform since February 2023. (Decl. Mark Vayngrib ("Vayngrib Decl."),[2] Dkt. 40-2, ¶ 6.) Plaintiff used the Exodus platform to store and manage cryptocurrency assets,

[1] The Terms are presented in the record in full at Dkt. 40-5.

[2] Mark Vayngrib is the Director of Technology for Defendant Exodus. (Vayngrib Decl., Dkt. 40-2, ¶ 2.)

including Ethereum ("ETH") and Solana ("SOL"). (*See* Am. Compl., Dkt. 18, at ECF[3] 3.) Plaintiff accessed her Exodus Wallet via Exodus's desktop and mobile applications.[4] (Vayngrib Decl., Dkt. 40-2, ¶ 6.)

### A. The Arbitration Clause

During the period relevant to Plaintiff's claims, users of the mobile application were brought to a screen on which they had to click either "Create New Wallet" or "I Already Have a Wallet" and, below these options, were told that "[b]y continuing, you agree to our Terms of Use," with "Terms of Use" appearing in different color text. (*Id.* ¶ 7(a) & n.1.) When downloading the desktop application, users were presented with a drop-down menu (shown below) that, at the bottom, stated that "[b]y downloading Exodus, you agree to the Terms of Service," with "Terms of Service" appearing in underlined text that hyperlinked to the Terms and changed color when users hovered their mouse over "Terms of Service," (*id.* ¶ 7(c)):[5]

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[4] After the alleged theft, Plaintiff also utilized Exodus's browser extension via a web browser application, as opposed to a standalone application. (Vayngrib Decl., Dkt. 40-2, ¶ 6.)

[5] Defendant's declaration includes screenshots reflecting the screens described, (*see generally* Vayngrib Decl., Dkt. 40-2), including the image shown in the text.




Plaintiff created an Exodus Wallet via Exodus's desktop application on February 13, 2023, and first accessed her Wallet via Exodus's mobile application on February 14, 2023. (*Id.* ¶ 6.)

The Terms require users to arbitrate any disputes:

> You agree that any dispute or claim relating in any way to your access or use of the Site, Services, or Software, or to any aspect of your relationship with Exodus, will be resolved by binding arbitration, rather than in court, except that (1) you may assert claims in small claims court if your claims qualify, so long as the matter remains in such court and advances only on an individual (non-class, non-representative) basis; and (2) you or Exodus may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents). **This Arbitration Agreement will apply, without limitation, to all claims that arose or were asserted before the Effective Date of this Agreement or any prior version of this Agreement.**

(Terms, Dkt. 40-5, § 9.1.)

Additionally, the Terms specify that "[t]he arbitrator, and not any federal, state or local court or agency will have exclusive authority to: (a) Determine the scope and enforceability of this

Arbitration Agreement; and (b) Resolve any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement." (*Id.* § 9.3.)

### B. Unauthorized Withdrawal and Conversion of Cryptocurrency in Plaintiff's Exodus Wallet

On or about September 6, 2024, without Plaintiff's authorization, approximately 54.48 ETH, which Plaintiff alleges is valued at approximately $187,123.26, was withdrawn from her Exodus Wallet. (Am. Compl., Dkt. 18, at ECF 3.) On September 8, 2024, Plaintiff filed a police report with the New York City Police Department ("NYPD") regarding the disappearance of her cryptocurrency and subsequently reported the incident to the Federal Bureau of Investigation ("FBI"). (*Id.*) On or around November 9, 2024, Plaintiff's Exodus Wallet displayed a static balance of "CNN tokens," initially valued at over $1.5 billion and later increasing to a value of $6.8 billion, which "remained without fluctuation for several months and was ultimately removed by Defendant Exodus "without adequate explanation."[6] (*Id.*) Plaintiff also experienced unauthorized transactions involving 208.868 SOL tokens, which Plaintiff alleges is valued at approximately $41,771.87, being deposited and withdrawn from her Exodus Wallet within minutes without her consent. (*Id.*) Throughout this period, Plaintiff suffered recurring fee charges, failed transaction attempts, and "significant emotional distress" due to ongoing suspicious activities in her Exodus Wallet account. (*Id.*)

## II. Procedural History

Plaintiff brings four claims against Defendant: (1) "negligence," (2) "gross negligence and willful misconduct," (3) "fraudulent misrepresentation and omission," and (4) "emotional

[6] Defendant explains that "CNN appears to be a 'scam token.'" (Def.'s Mem. Supp. Mot. Compel Arb., Dkt. 40-1, at 5 n.3.) Plaintiff does not refute this explanation, and, in any event, the nature of these "CNN tokens" is immaterial to the Court's analysis of the motion to compel arbitration.

distress." (*Id.* at ECF 3–4.) In sum, she seeks to hold Defendant accountable for its purported failures to "maintain secure operations of the Exodus Wallet platform," safeguard her digital assets, respond appropriately to "known platform vulnerabilities," and act upon her complaints. (*Id.*) She seeks compensatory damages in the amount of $1,037,000 ($287,000 for cryptocurrency losses and $750,000 for emotional distress damages). (*Id.* at ECF 4.) She also seeks injunctive relief in the form of certain information disclosures, the implementation of security measures, and the provision of "continued technical support." (*Id.* at ECF 5.)

In response, Defendant has moved for an order compelling arbitration of all of Plaintiff's claims, or, in the alternative, dismissal of those claims for failure to state a claim upon which relief can be granted. (Def.'s Mem. Supp. Mot. Compel Arb., Dkt. 40-1.)

## DISCUSSION

### I. Legal Standard for Motions to Compel Arbitration

The Federal Arbitration Act ("FAA") requires courts to compel arbitration of claims that the parties have agreed to arbitrate. *See AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." (citations omitted)). "Arbitration is a matter of contract and consent," and "disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024). Therefore, "[c]ourts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015)). Those issues are decided based on "state contract law principles." *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted).

"To determine whether parties agreed to arbitrate, courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 115 (2d Cir. 2025) (quoting *Nicosia*, 834 F.3d at 229). Namely, courts must "consider all relevant, admissible evidence submitted by the parties" and must "draw all reasonable inferences in favor of the non-moving party." *Id.* (quoting same). "The party seeking arbitration bears the initial burden of demonstrating that an agreement to arbitrate exists." *Id.* Additionally, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Collazos v. Garda CL Atl., Inc.*, 666 F. Supp. 3d 249, 260 (E.D.N.Y. 2023) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

"Whether or not the parties have agreed to arbitrate is a question of state contract law." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). As to which state's law applies, "[i]ssues of contract formation are governed by the choice-of-law doctrine of the forum state, which in this case is New York." *Kassim v. CVS Albany, LLC*, No. 21-CV-2927 (PKC) (TAM), 2022 WL 4357456, at *6 (E.D.N.Y. Sep. 20, 2022) (citation omitted). New York's choice-of-law rules direct courts to "evaluate the 'center of gravity' or 'grouping of contacts,' with the purpose of establishing which state has 'the most significant relationship to the transaction and the parties.'" *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (citation modified) (quoting *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 618 N.Y.S.2d 609, 612 (1994)).

Here, the Court finds that New York law applies because New York has the most significant contacts with the formation of the contract. Plaintiff is a resident of New York, (*see* Am. Compl., Dkt. 18, at ECF 2), and without any suggestions in the record to the contrary, the Court infers that Plaintiff downloaded the Exodus application and created her Exodus Wallet (and

purportedly agreed to its Terms) in New York. The only potential alternative contacts are Nebraska, where Defendant is headquartered, or Delaware, where Defendant is incorporated and is the state mentioned in the Terms as the governing law.[7] Defendant assumes Delaware law applies, and Plaintiff does not speak to the issue, but the Court finds that it would be inappropriate to apply Delaware law simply because the choice-of-law provision dictates it. *See Schnabel*, 697 F.3d at 119 (recognizing that where the issue is whether a contract was formed, it would be inappropriate to employ the choice-of-law provision's state law because "[a]pplying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established" (citations omitted)). In any event, "traditional contract formation law does not vary meaningfully from state to state," *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702–03 (2d Cir. 2023), and, even when applying New York law, Defendants are entitled to an order compelling arbitration.

## II. Plaintiff's Claims Must Be Arbitrated

### A. Plaintiff Agreed to the Arbitration Clause

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (citations omitted). "[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that [she has] at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22,

---

[7] (*See* Terms, Dkt. 40-5, § 10.6 ("[T]he terms and any action related thereto will be governed and interpreted by and under the laws of the state of Delaware, consistent with the Federal Arbitration Act, without giving effect to any principles that provide for the application of the law of another jurisdiction.").)

25 (2d Cir. 2010) (summary order) (citations omitted); *see also Starke v. Gilt Groupe, Inc.*, No. 13-CV-5497 (LLS), 2014 WL 1652225, at *2 (S.D.N.Y. Apr. 24, 2014) (explaining that "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (citation omitted)).

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (citations omitted). "'Courts around the country have recognized that [an] electronic "click" can suffice to signify the acceptance of a contract,' and that '[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.'" *Id.* (alterations in original) (citation omitted). The Second Circuit has held that, even where there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a "'reasonably prudent' person would be on inquiry notice" of the terms, *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021) (emphasis omitted) (citation omitted), and (2) the user unambiguously manifests assent "through . . . conduct that a reasonable person would understand to constitute assent," *Schnabel*, 697 F.3d at 120.

As to the first inquiry, whether a "reasonably prudent" person would be on inquiry notice of the terms, here, Defendant has satisfied its burden. Courts look to "factors like whether: (i) the seller directs the consumer's attention to the hyperlink; (ii) the webpage was muddled with information unrelated to the purchase; (iii) there was any language advising the plaintiff to click on the hyperlinks containing the terms; and (iv) the terms were spatially and temporally coupled with the transaction," *Griffiths v. U-Haul Int'l, Inc.*, No. 26-CV-1092 (HG), 2026 WL 2322832, at *3 (E.D.N.Y. Aug. 11, 2026), all of which are present here. The link to the Terms was clearly

presented directly below the "Download Exodus" box, there was no other information crowding or muddling the link to the Terms, the language clearly directed the user to click the link to view the Terms, and the timing and location were a natural coupling with the "Download Exodus" action. *See id.* at *4–6 (finding inquiry notice based on similar facts and analysis); *see also Meyer*, 868 F.3d at 77–78 ("[A] reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found."); *Manalis v. Primis Bank*, No. 25-CV-3066 (OEM) (TAM), 2026 WL 2139021, at *13 (E.D.N.Y. July 24, 2026) (collecting cases and noting that "[c]ourts in this Circuit have consistently found that an arbitration agreement was sufficiently conspicuous and put a plaintiff on inquiry notice where the hyperlink containing the specific terms of the agreement appears next to a 'consent' or 'sign up' button").

Defendant has also satisfied the second inquiry, that Plaintiff unambiguously manifested assent. In making this determination in the context of web-based contracts, the Second Circuit has considered

> (1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms; (2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at [a] time when the consumer would expect to receive such terms; and (3) the "course of dealing between the parties," including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms.

*Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704–05 (2d Cir. 2023) (citations omitted). Here, Exodus presented a clear warning: "the text on the [Wallet creation screen] not only included a hyperlink to the [Terms], but expressly warned the user that by [downloading Exodus and] creating [a Wallet], the user was agreeing to be bound by the linked terms." *See Meyer*, 868 F.3d at 80; *cf. Nicosia*, 834 F.3d at 236 (finding no manifestation of assent to terms where "the presentation of

terms [was] not directly adjacent to the . . . button so as to indicate that a user should construe clicking as acceptance"). Furthermore, Exodus presented the Terms to Plaintiff at a time when one would expect to receive such terms: at the point of enrollment in the service. *See Schnabel*, 697 F.3d at 127 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial . . . enrollment, or the use of . . . [the] services from which the recipient benefits at least indicates to the consumer that he or she is . . . employing such services subject to additional terms and conditions that may one day affect him or her."). Finally, when Plaintiff downloaded the mobile application for Exodus and logged in the day after creating the Wallet on the desktop application, she once again was presented with the Terms and assented. (*See* Vayngrib Decl., Dkt. 40-2, ¶ 7(a).) Other courts have held that similar presentations of terms constituted assent to arbitrate. *See, e.g.*, *Ziboukh v. Whaleco, Inc.*, 795 F.Supp.3d 349, 362–63, 391 (E.D.N.Y. 2025) (granting motion to compel arbitration where registration screen contained a "Continue" button and text below stating that "[b]y continuing, you agree to our Terms"); *Thorne v. Square, Inc.*, No. 20-CV-5119 (NGG) (TAM), 2022 WL 542383, at *8–12 (E.D.N.Y. Feb. 23, 2022) (granting motion to compel arbitration where registration screen contained a "Next" button and text stating "[b]y continuing, you agree to the [t]erms").

In opposition, Plaintiff raises a slew of boilerplate arguments, each largely untethered to the particular facts of this case. None have merit. First, she argues that she never assented to an agreement to arbitrate. (Pl.'s Opp'n Mot. Compel Arb. ("Pl.'s Opp'n"), Dkt. 39, at 1–2.) Specifically, she argues that she "never signed, reviewed, or affirmatively accepted any arbitration agreement." (*Id.* at 2.) But there is no requirement that she have "signed" any agreement or reviewed the terms. And to the extent she argues that she never accepted the Terms, the Court disregards those conclusory claims, which are contradicted by the evidence Defendant has

presented, as discussed above. *See Faith v. Khosrowshahi*, No. 21-CV-6913 (JMA) (JMW), 2023 WL 5278126, at *6 (E.D.N.Y. Aug. 16, 2023) (granting motion to compel arbitration and finding that *pro se* plaintiff's "unsworn statements and unsubstantiated allegations are insufficient to overcome [d]efendants' evidence" indicating that plaintiff had agreed to the arbitration provision); *O'Callaghan v. Uber Corp. of Cal.*, No. 17-CV-2094 (ER), 2018 WL 3302179, at *5, 7 (S.D.N.Y. July 5, 2018) (rejecting *pro se* plaintiff's "bare assertion that he never assented to the arbitration provision" and noting that plaintiff "may not rely on unsupported assertions, conjecture, or surmise"). The Court similarly disregards Plaintiff's unsubstantiated claims that "Defendant did not present arbitration terms at account creation." (Pl.'s Opp'n, Dkt. 39, at 2.) Plaintiff's arguments that the Terms were "hidden" and thus not conspicuous is contrary to fact and law as the Terms were plainly presented to her, and, as discussed above, the manner in which Defendant presented them was sufficiently conspicuous as a matter of law.

Second, Plaintiff argues that the arbitration clause is procedurally and substantively unconscionable and thus unenforceable. (*Id.* at 3.) She argues it was procedurally unconscionable because of the unequal bargaining power in so far as she as a consumer had "no meaningful opportunity to reject arbitration," and because it was "hidden within lengthy terms." (*Id.*) But the notion of a "take it or leave it" or adhesion contract "may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability." *Klos v. Lotnicze*, 133 F.3d 164, 169 (2d Cir. 1997); *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 122 (2d Cir. 2010) (finding that assertions that the signatory did not read the arbitration agreement or that it was offered on a take it or leave it basis did not render the arbitration agreement procedurally unconscionable). Plaintiff makes no such showing here. Meanwhile, her substantive unconscionability argument is merely a facial attack

on arbitration as an alternative forum for dispute resolution, (*see* Pl.'s Opp'n, Dkt. 39, at 3 (taking issue with the arbitration provision "diverting claims into a private forum that restricts discovery and transparency")), which does nothing to undo the parties' agreement to arbitrate, *see, e.g.*, *Klein v. AT&T Corp.*, No. 23-CV-11038 (DEH) (RFT), 2024 WL 3409041, at *5 (S.D.N.Y. July 15, 2024) (rejecting similar argument because, "[a]s a policy matter, it may (or may not) be the case that there should be greater 'transparency and accountability' around these sorts of disputes, but that policy argument is not a legal basis for disturbing the parties' agreement" (citation omitted)).

Third, Plaintiff argues that Defendant waived its right to compel arbitration through its conduct, specifically because Defendant purportedly "did not promptly invoke arbitration" and "asserted arbitration only after Plaintiff sought relief." (Pl.'s Opp'n, Dkt. 39, at 4–5.) This argument is meritless. Defendant moved to compel arbitration immediately after being served with Plaintiff's original Complaint. (*See* Def.'s Ltr., Dkt. 14.) Plaintiff provides no legal authority, and the Court finds none, suggesting that a defendant raising arbitration in response to a complaint seeking relief based on a contract that contains an arbitration clause is untimely or inappropriate, or constitutes waiver. Indeed, Plaintiff does not explain how Defendant could have raised arbitration any sooner.

Finally, Plaintiff argues that "[c]ompelling arbitration here would undermine consumer protection and accountability and operate inequitably by restricting discovery and remedies," and that "[a]rbitration cannot operate to prospectively waive a party's ability to pursue statutory remedies." (Pl.'s Opp'n, Dkt. 39, at 5.) But, tellingly, Plaintiff's case citation substantiating her argument is a Supreme Court decision *declining* to recognize such grounds to invalidate an arbitration clause. (*Id.* (citing *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–36 (2013)).) Furthermore, this is yet another facial attack on arbitration as an alternative forum for dispute

resolution that does not undermine the parties' agreement to arbitrate. *See Klein*, 2024 WL 3409041, at *5 (finding that "policy argument is not a legal basis for disturbing the parties' agreement" (citation omitted)).

**B. The Arbitration Clause Encompasses Plaintiff's Claims**

The Terms require the arbitration of "any dispute or claim relating in any way to your access or use of the Site, Services, or Software, or to any aspect of your relationship with Exodus," subject to exceptions not relevant here. (Terms, Dkt. 40-5, § 9.1.) This dispute plainly relates to Plaintiff's relationship with Exodus and Plaintiff's use of Exodus's software: Plaintiff complains of inadequate security measures taken to protect her assets stored in her Exodus Wallet. Her claims therefore must be arbitrated. Moreover, because the Terms give the arbitrator—and not the Court—"exclusive authority" to "[d]etermine the scope and enforceability of this Arbitration Agreement" and "[r]esolve any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement," (*id.* § 9.3), there is "clear and unmistakable evidence" that the parties agreed to delegate gateway questions of arbitrability to the arbitrator, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69, 72 (2019) (citations omitted). Thus, the Court must compel arbitration even if there is any ambiguity regarding the arbitration clause's applicability to Plaintiff's claims.

**CONCLUSION**

Defendant's motion to compel arbitration is granted and stays this case pending arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 3. The Court dismisses as moot Defendant's alternative argument for dismissal. The parties are directed to inform the Court within one (1) week of any resolution of the arbitration proceedings, or of any other event that would affect the stay of this matter.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2026
Brooklyn, New York